2022R00188/JSG

RECEIVED

MAY 1 0 2022

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. *Peter G. Sheridan* |
| | : | |
| v. | : | Criminal No. 22- *334 (PGS)* |
| | : | |
| LAUREN B. PHILHOWER | : | 18 U.S.C. § 371 |

# I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the Attorney for the United States for the District of New Jersey acting under the authority of 28 U.S.C. § 515 charges:

## (Conspiracy to Violate the Travel Act)

1.      Unless otherwise indicated, at all times relevant to this Information:

        a.      Defendant Lauren B. Philhower ("PHILHOWER") resided in Los Angeles, California.

        b.      Co-conspirator Anastasia A. Passas ("Passas"), charged in a separate Information, resided in Los Angeles, California.

        c.      Co-conspirator Kevin M. Dickau ("Dickau"), charged in a separate Information, resided in Tustin, California.

        d.      Co-conspirator Seth Logan Welsh ("Welsh"), charged in a separate Information, resided in Forest Hill, Maryland.

        e.      Co-conspirator John C. Devlin ("Devlin"), charged in a separate Information, resided in Los Angeles, California.

f.      Co-conspirator Peter J. Costas ("Costas"), charged in a separate Information, resided in Red Bank, New Jersey.

g.      Patient D.J. resided in Red Bank, New Jersey and suffered from heroin addiction. Patient D.J. maintained health insurance through a private insurer that was a health care benefit program as defined under 18 U.S.C. § 24(b).

h.      Patient J.S. resided in Westchester, Ohio and suffered from heroin addiction. Patient J.S. maintained health insurance through a private insurer that was a health care benefit program as defined under 18 U.S.C. § 24(b).

i.      "Drug Treatment Center-1" was a drug treatment facility offering Partial Hospitalization Programs ("PHP"), Intensive Outpatient Programs ("IOP"), and Outpatient Programs ("OP") located in Los Angeles, California. PHILHOWER and Passas owned and operated Drug Treatment Center-1, which was licensed under California state law.

j.      "Drug Treatment Center-2" was a drug treatment facility offering PHP, IOP, and OP programs located in Santa Ana, California. PHILHOWER and Passas owned and operated Drug Treatment Center-2, which was licensed under California state law.  Drug Treatment Center-1 and Drug Treatment Center-2 are referred to collectively here as the "Drug Treatment Centers."

k.      The "Drug Treatment Centers" engaged in the "practice of processing, presenting, or negotiating claims, including claims under policies of insurance," as those terms are described in California Insurance Code § 750.

l.      "Marketing Company-1" was a marketing company incorporated in California and was owned and operated at various times by Dickau, Welsh, Devlin, and others.  Costas was a recruiter for Marketing Company-1.

Federal and California State Guidelines for Substance Abuse Treatment

m.      The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA"), was tasked with establishing and implementing a comprehensive program to improve treatment and related services to individuals concerning substance abuse and protecting the rights of substance abusers. 42 U.S.C. § 290aa.

n.      "Substance abuse" was defined generally as the abuse of alcohol or other drugs. "Treatment" meant the "care of a patient suffering from a substance use disorder, a condition which is identified as having been caused by the substance abuse disorder, or both, in order to reduce or eliminate the adverse effects upon the patient," as set forth in 42 C.F.R. § 2.11.

o.      Substance abuse treatment facilities provided services to assist patients in overcoming their addictions, including Detox centers, PHPs, IOPs, and OPs. Services and testing at Detox centers, PHPs, IOPs, or OPs could be billed to health care benefit programs when they were medically necessary and provided by, or overseen by, licensed medical professionals.

p.      Insurance coverage for substance abuse treatment and testing was available through health plans offered directly by private insurance companies,

in addition to government-funded insurance providers. The private health insurance providers were "health care benefit programs," as defined by 18 U.S.C. § 24(b); that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

q.    California Insurance Code section 750 criminalizes receiving or paying remuneration for referrals to any person or entity that bills claims under insurance policies, which includes recovery homes, clinical treatment facilities, and laboratories.

<u>The Conspiracy</u>

2.    From at least as early as in or about October 2017 through in or about October 2019, in the District of New Jersey and elsewhere, defendant

**LAUREN B. PHILHOWER**

did knowingly and intentionally conspire and agree with Passas, Dickau, Welsh, Devlin, and others, to commit an offense against the United States, that is, to knowingly and intentionally travel in interstate commerce and use and cause to be used the mail and facilities in interstate commerce with intent to distribute the proceeds of any unlawful activity and otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of any unlawful activity, that is, paying kickbacks to induce patient referrals to the Drug Treatment Centers and, thereafter, perform acts to distribute the proceeds of any unlawful activity and otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, carrying on, of such unlawful activity,

4

contrary to California Insurance Code § 750 and Title 18, United States Code, Sections 1952(a)(1) and (3).

## Goal of the Conspiracy

3.     The goal of the conspiracy was for PHILHOWER and Passas to unlawfully profit by paying kickbacks to marketing companies in exchange for patient referrals to the Drug Treatment Centers that generated revenue for them through the billing of health care benefit programs for services.

## Manner and Means of the Conspiracy

4.     PHILHOWER helped to orchestrate a patient recruitment and brokering scheme in and around California, New Jersey, Maryland, and elsewhere, in which the Drug Treatment Centers paid fees to marketing companies, including Marketing Company-1, for referrals of patients suffering from addiction. The scheme worked as follows.

5.     The Drug Treatment Centers, through PHILHOWER and Passas, contracted with various marketing companies, including Marketing Company-1, to pay kickbacks in exchange for patient referrals. To identify patients, the marketing companies engaged a nationwide network of recruiters, including Costas and other recruiters in New Jersey, who were instructed to identify individuals who: (a) were covered under a health care benefit program, as defined by 18 U.S.C. § 24(b); and (b) were addicted to heroin, another drug, or alcohol.

6.     Marketing Company-1 was one such company that had a contract with PHILHOWER and Passas's Drug Treatment Centers and sought to identify

prospective patients to refer. Specifically, Dickau, Welsh, and Devlin communicated frequently with employees of the Drug Treatment Centers, including PHILHOWER and Passas, to discuss Marketing Company-1's recruitment of potential patients. Oftentimes, Marketing Company-1 transmitted prospective patient information to employees of the Drug Treatment Centers, including patients' health insurance information, so PHILHOWER and Passas could evaluate whether to enroll the patient and potentially pay Marketing Company-1 a referral payment in return.

7.     After receiving patients' health insurance information from Marketing Company-1, PHILHOWER directed employees of the Drug Treatment Centers to try to verify the patients' insurance benefits. Part of the purpose of verifying each patient was so that PHILHOWER and Passas could determine if the patient had sufficient insurance coverage to make enrolling the patient profitable for the Drug Treatment Centers—and worth the kickback that PHILHOWER would authorize to be paid to Marketing Company-1.

8.     Once Drug Treatment Center-1 successfully verified the patient's insurance and accepted the patient for enrollment, PHILHOWER, Passas, and their employees at the Drug Treatment Centers discussed with Marketing Company-1 how to transport the patient to the Drug Treatment Centers. Typically, Marketing Company-1 paid for the patient's transportation, including from states like New Jersey.

9.     Once a patient enrolled at one of PHILHOWER and Passas's Drug Treatment Centers, Marketing Company-1 would encourage the patient to remain

there for at least 10 days. That time period ensured that the Drug Treatment Centers billed the patient's health care benefit program enough to guarantee that the Drug Treatment Centers could profitably pay a referral payment to Marketing Company-1.

10.     The amount of the referral payments from PHILHOWER and Passas's Drug Treatment Centers to Marketing Company-1 was based on several factors, including: (a) the number of patients referred in a given month; (b) the duration of the patient's stay; (c) the level of treatment required by the patient; and (d) the patient's type of insurance coverage. PHILHOWER and Passas paid Marketing Company-1 larger referral payments the longer a patient remained at the Drug Treatment Centers after 10 days. Generally speaking, however, the Drug Treatment Centers paid Marketing Company-1 approximately $5,000 for each patient that Marketing Company-1 referred.

11.     At the direction of Dickau, Welsh, and Devlin, Marketing Company-1 in turn paid a percentage of the referral payment to its recruiters, who typically received approximately 50% of the referral payment.

12.     PHILHOWER often tried to disguise the kickbacks to pretend that they were legitimate payments.  For example, PHILHOWER and Passas created "contracts" with the marketing companies, including Marketing Company-1, to give the false impression that the Drug Treatment Centers were paying them a flat fee each month for patient referrals, instead of an amount that varied based on the number of patients sent, the duration of their stay, and the quality of their insurance.

13.     In total, PHILHOWER and Passas, through the Drug Treatment Centers, were paid over $550,000 from health care benefit programs based on the illegal kickbacks they paid to marketing companies as part of the scheme.

## Overt Acts

14.     To advance the conspiracy and to effect its object, PHILHOWER, Passas, and others, committed and caused to be committed the following overt acts in the District of New Jersey and elsewhere:

a.      In or about March 2018, Marketing Company-1 and Costas recruited and referred Patient D.J. to Drug Treatment Center-1. Patient D.J. was recruited by Costas in New Jersey, and Patient D.J. traveled from New Jersey to California before he enrolled at Drug Treatment Center-1.

b.      On or about March 19, 2018, PHILHOWER and Passas enrolled Patient D.J. at Drug Treatment Center-1. Patient D.J. stayed at Drug Treatment Center-1 for approximately one week, during which time Drug Treatment Center-1 submitted claims to a health care benefit program for approximately $17,850 and was reimbursed approximately $2,700.

c.      Subsequently, PHILHOWER and Passas caused a kickback of $12,500 to be paid to Marketing Company-1 for its referral of Patient D.J. and other patients.

d.      In or about November 2018, Marketing Company-1 recruited Patient J.S. and referred Patient J.S. to Drug Treatment Center-2.

e.      On or about November 30, 2018, PHILHOWER and Passas enrolled Patient J.S. at Drug Treatment Center-2. Patient J.S. stayed at Drug Treatment Center-2 for approximately 21 days, during which time Drug Treatment Center-2 submitted claims to a health care benefit program for over $20,000 and was reimbursed approximately $9,700.

f.      Subsequently, PHILHOWER and Passas caused a kickback of $4,250 to be paid to Marketing Company-1 for its referral of Patient J.S.

g.      Between on or about November 1, 2018 and on or about December 31, 2018, PHILHOWER and Passas transferred approximately $44,970, $23,000, and $3,000 into bank accounts owned or controlled by the principals of Marketing Company-1. Those payments represented kickbacks for Marketing Company-1's referral of patients to PHILHOWER and Passas's Drug Treatment Centers.

h.      On or about March 14, 2019, at the direction of PHILHOWER, an employee of the Drug Treatment Centers ("Employee-1") spoke to Welsh on the telephone and stated "I know you wanna go over your monies . . . . Here's what I'll do. I'll send you a screenshot of the, of the screen of the marketing sheets that I have for you." The "marketing sheets" were a catalogue of the patients referred to the Drug Treatment Centers by Marketing Company-1 and the corresponding referral payments the Drug Treatment Centers owed to Marketing Company-1.

i.      The same day, in an interstate text message sent from Employee-1's cellular telephone in California to Welsh's cellular telephone in Maryland,

9

Employee-1 sent Welsh a photo of Employee-1's laptop computer. The photo contained an image of a patient tracking spreadsheet.

In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

1.     The allegations contained in Paragraphs 1 through 14 of this Information are incorporated here for the purpose of alleging forfeiture, pursuant to 18 U.S.C. § 982(a)(7).

2.     Upon conviction of the offense of conspiracy to violate the Travel Act, contrary to 18 U.S.C. § 1952(a)(1) and (a)(3), in violation of 18 U.S.C. § 371, as alleged in this Information, PHILHOWER shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, obtained by the defendant that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of such offense.

### Substitute Assets Provision

3.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   (a)     cannot be located upon the exercise of due diligence;

   (b)     has been transferred or sold to, or deposited with, a third person;

   (c)     has been placed beyond the jurisdiction of the Court;

   (d)     has been substantially diminished in value; or

   (e)     has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

VIKAS KHANNA
Attorney for the United States
Acting Under the Authority of 28 U.S.C. § 515

CASE NUMBER: _22 - 334_ (PGS)

## United States District Court
## District of New Jersey

# UNITED STATES OF AMERICA

## v.

# LAUREN B. PHILHOWER

## INFORMATION FOR
### 18 U.S.C. § 371

### VIKAS KHANNA
*ATTORNEY FOR THE UNITED STATES,*
*ACTING UNDER THE AUTHORITY OF 28 U.S.C. § 515*
*NEWARK, NEW JERSEY*

JASON S. GOULD
*ASSISTANT U.S. ATTORNEY*
*(973) 645-2776*

USA-48AD 8
(Ed. 1/97)